**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| MATTHEW GREEN, | ) 3:12-cv-00004-LRH-WGC |
| | ) |
| Plaintiff, | ) **REPORT & RECOMMENDATION** |
| | ) **OF U.S. MAGISTRATE JUDGE** |
| | ) |
| vs. | ) |
| | ) |
| ROBERT BANNISTER, et. al. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is defendant Dr. Bannister's motion for summary judgment. (Doc. # 54.)[1] Plaintiff has opposed the motion (Doc. # 63) and Dr. Bannister filed a reply (Doc. # 66). In addition, Plaintiff has filed a cross-motion for summary judgment. (Doc. # 64.)[2] Dr. Bannister did not file a separate response to Plaintiff's cross-motion for summary judgment. The court will therefore construe his reply in support of his motion for summary judgment as his response to Plaintiff's motion as well.

---

[1]  Refers to court's docket number.
[2]  The opposition (Doc. # 63) and cross-motion (Doc. # 64) were contained within the same document but were docketed separately by the Clerk.

1

After a thorough review, the court recommends that Dr. Bannister's motion (Doc. # 54) and Plaintiff's cross-motion (Doc. # 64) be denied.

## I. BACKGROUND

**A. SUMMARY OF ACTION**

At all relevant times, Plaintiff Matthew Green was in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Compl. (Doc. # 1-1).) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. §1983. *(Id.)* On screening, the court determined that Plaintiff could proceed with his Eighth Amendment claim for deliberate indifference to a serious medical need. (Screening Order (Doc. # 5).) The only remaining defendant is Dr. Robert Bannister, the Medical Director of NDOC and member of the Utilization Review Panel (URP). (*See* Doc. # 1-1, Doc. # 5, # 65 (Minutes reflecting dismissal of Def. Graham without prej.).)[3]

Plaintiff's complaint centers around his allegation that Dr. Bannister and the dismissed defendants were deliberately indifferent to his serious medical need when they failed to provide appropriate care for his hernia. (Doc. # 1-1.) Plaintiff alleges that in March 2011, he sought medical attention for his hernia, which had become extremely painful and interfered with his ability to perform his light-duty job. (*Id.* at 4.) He contends Dr. Graham (subsequently identified as Nurse Graham who is now deceased, *see* Doc. # 66 at 2 n. 1) told him that NDOC does not allow inmates to have hernia surgery. (*Id.*) A nurse gave him a hernia belt in the wrong size which caused more pain upon use. (*Id.*) Plaintiff avers that Dr. Bannister refused to allow Plaintiff to receive any meaningful treatment for his hernia and related pain. (*Id.* at 4-5.) He

---

[3]  Warden Neven was dismissed on screening. (Doc. # 5.) Dr. Robert Graham was dismissed without prejudice for failure to serve him within 120 days. Finally, Plaintiff named a Doe Defendant but an actual defendant has never been substituted in place of the Doe defendant. (Doc. # 65.) Consequently, the court recommends that the District Judge enter an order notifying Plaintiff of its intent to dismiss the Doe Defendant without prejudice as a result of his failure to timely identify, name and serve such defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

2

alleges that his doctors agree that his hernia requires surgery, but Dr. Bannister has continually denied this request. (*Id*. at 5-6.) Plaintiff seeks compensatory and punitive damages as well as injunctive relief. (*Id*. at 8.)

**B. DR. BANNISTER'S MOTION FOR SUMMARY JUDGMENT**

Dr. Bannister moves for summary judgment. (Doc. # 54, Doc. # 54-1 (Bannister Decl.).) Preliminarily, Dr. Bannister argues that the applicable two-year statute of limitations bars Plaintiff's claim against him because the alleged denial of surgery took place on September 2, 2008, and Plaintiff did not file this action until 2012. (Doc. # 54 at 4.)

Next, Dr. Bannister argues that even if the statute of limitations does not bar this action, his conduct does not amount to deliberate indifference. (*Id*.) Instead, he contends that he made a medical determination with which Plaintiff disagrees and is not actionable because Plaintiff cannot show that the chosen course of treatment  was "medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk" to his health. (*Id*.)

According to Dr. Bannister, when Plaintiff was re-incarcerated within NDOC in 2008, a consultation regarding his hernia was scheduled in August 2008, and the treating physician referred his case to the URP, of which Dr. Bannister is a member. (Doc. # 54 at 2, Doc. # 54-1 ¶ 7.) In September 2008, the URP considered various factors in determining that surgery was not warranted, and instead determined that "watchful waiting was the most medically sound course of action." (*Id*., ¶ 9.)[4] Dr. Bannister asserts that Plaintiff was seen regularly by NDOC physicians (*id*. at 6, citing Ex. C 1-16), his hernia was treated with a truss pain medication and work restrictions were implemented (*id*. citing Ex. C 14), and his medical needs were carefully

---

[4]  The factors considered include the urgency of care, medical necessity, the ability of patient to safely perform activities of daily living, risks and benefits of proposed treatment, available resources and natural history of the illness/condition. (Doc. # 64-1 at 2 ¶ 5.)

3

monitored by NDOC (*id*. citing Ex. C, Progress Notes, 2-15). Plaintiff was not referred back to the URP again by a treating physician. (*Id*. at 3 ¶ 8.)

**C. PLAINTIFF'S OPPOSITION AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff opposes Dr. Bannister's motion and also moves for summary judgment. (Docs. # 63, # 64.)

In  response to Dr. Bannister's statute of limitations defense, Plaintiff states that he is not claiming Dr. Bannister was deliberately indifferent to his serious medical needs on September 2, 2008, when the URP denied the surgery referral. (Docs. # 63, #64 at 2 ¶6.) Instead, he contends Dr. Bannister was deliberately indifferent to his serious medical needs from March 2011 through the present, when Plaintiff continually complained of pain related to his hernia that would not easily reduce and requested that it be repaired, to no avail. (*Id*. at 2-5, Exhibits 17-22 at Doc # 63 at 121-131.)[5] Not only did Dr. Bannister deny the request for surgery in 2008, but he was also on notice of the fact that Plaintiff's condition was worsening and that he was in pain because Dr. Bannister personally responded to two second level grievances detailing these issues in 2011 (which is within the statute of limitations period). (*Id*. at 2-3 ¶¶ 8-9, Exhibits 11-12 at Doc. # 63 at 71-.) Dr. Bannister's grievance responses upheld the decisions made at the informal and first level which denied the grievances and essentially declined to do anything further to repair the hernia. (*Id*.)

Plaintiff argues that Dr. Bannister admits that a hernia will not heal on its own, and that the truss that was prescribed may actually have done more harm than good. (*Id*. at 3 ¶¶ 10-14,

---

[5]  Exhibits 17 to 22 contain medical requests sent by Plaintiff that discuss his hernia and pain associated with his condition and requests for relief. (Doc. # 63 at 121-131.)

and citing Dr. Bannister's responses to Pl.'s Requests for Admissions.)[6] Plaintiff further contends that Dr. Bannister is aware that Plaintiff's hernia condition went from being "reducible" in 2008 to "incarcerated" in December 2012. (Doc. # 63 at 4 ¶ 20.)[7]

According to Plaintiff, when he was seen by Dr. Mar in March of 2013, he was told that surgery was necessary and that he would be scheduled to see a surgeon if this was approved by the URP. (*Id.* at 4 ¶21, Ex. 23 at Doc. # 63 at 133.) Plaintiff contends Dr. Bannister is aware of this. (*Id.* at 5 ¶ 24, Exhibits 24-25 at Doc. # 63 at 135-137.)[8]

In response Dr. Bannister's argument that his conduct is not actionable because it merely constitutes a difference of opinion, Plaintiff contends that when a treating physician recommends a course of action and that is ignored by higher level medical administrators, that is deliberate indifference and not a mere difference of opinion. (Doc. # 63 at 8.)

Plaintiff likens this case to *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012), where

---

[6]   Request for Admission 14 asked Dr. Bannister to admit or deny that an inguinal hernia will heal without corrective surgery. (Doc. # 63 at 23:17-18.) Dr. Bannister denied the request. (*Id.* at 23:19-20.) It appears that he is denying that an inguinal hernia will heal without corrective surgery. In other words, the hernia will not heal without corrective surgery. Request for Admission 18 asked Dr. Bannister to admit or deny that use of a truss on a patient with an inguinal hernia increases the instances and possibility of future harm and complications in treating inguinal hernias. (*Id.* at 24:2-4.) Dr. Bannister responded: "There are risks with the use of a truss. This is true with surgery as well. The treating physician assesses the potential benefit versus the risk with all treatment modalities." (*Id.* at 24:6-8.) Request for Admission 19 asked Dr. Bannister to admit or deny that the wearing of a truss by a patient with an inguinal hernia can lead to strangulation of the hernia, atrophy of the spermatic cord and atrophy of the fascial margins, allowing the defect to enlarge. (*Id.* at 24:9-12.) Dr. Bannister responded: "This is not a common side effect, but it has been reported. (*Id.* at 24:13-14.)

[7]   Plaintiff cites Dr. Bannister's response to his Request for Admission 8 where Plaintiff asked Dr. Bannister to admit or deny that as of December 26, 2012, Plaintiff's inguinal hernia was "incarcerated." (Doc. # 63 at 22:1-3.) Dr. Bannister responded: "I have no independent knowledge of this having never met you or examined you, however NDOC records reflect that, in December of 2012, you were incarcerated." (*Id.* at 22:4-6.) Plaintiff construes this as an admission by Dr. Bannister of knowledge that Plaintiff's *hernia* was "incarcerated" as of December 2012, which is apparently a medical term of art describing a trapped hernia. (*See* Doc. # 63 at 4 ¶ 20.) Dr. Bannister, on the other hand, clarifies in his reply that he was only responding that *Plaintiff* was incarcerated, *i.e.*, in prison, as of December 2012, and was not making an admission relative to the status of Plaintiff's hernia. (*See* Doc. # 66 at 3:26-27 to 4:1-14; Supp. Bannister Decl. at Doc. # 66-1.)

[8]   Exhibit 24 is a NDOC Consultation Request/Report which requests a referral to the surgical clinic for evaluation of Plaintiff's left inguinal hernia, dated March 15, 2013. (Doc. # 63 at 135.) Exhibit 25 is a consultant's report for Plaintiff dated April 15, 2013. (Doc. # 63 at 137.) It indicates that Plaintiff's left inguinal hernia has increased in size and the plan is to repair the condition. (*Id.*)

Dr. Bannister was part of the URP panel denying surgery when specialists had recommended surgery and decided it was better to treat Snow's condition with medication alone. There, the Ninth Circuit determined that summary judgment should be denied as to Dr. Bannister because material issues of fact existed as to whether the decision was deliberately indifferent to Snow's serious medical need. Here, Dr. Bannister denied Plaintiff's treating physician's request for surgery, finding that "watchful waiting" was the better alternative. Thus, Plaintiff claims that summary judgment should similarly be denied to Dr. Bannister.

Plaintiff contends that just because he was not subsequently submitted to the URP for a surgery referral does not mean Dr. Bannister is absolved of liability because Plaintiff sent two grievances in 2011 putting Dr. Bannister on notice of his condition and Dr. Bannister failed to take action. (Doc. # 63 at 11-12.)

Plaintiff then addresses Dr. Bannister's argument that he is entitled to summary judgment because Plaintiff continued to be seen by physicians within NDOC, and argues this is immaterial because Plaintiff's issues were not resolved through this care. (Doc. # 63 at 12-13.)

Finally, in his cross-motion for summary judgment Plaintiff argues there is no dispute of material fact and summary judgment should be granted in his favor as a matter of law. (Doc. # 63 at 14-15.) He reiterates that Dr. Bannister knew of Plaintiff's hernia, Plaintiff continually complained of pain associated with his hernia, other physicians ultimately recommended surgery, and Dr. Bannister knew the risks of not treating with corrective surgery. (*Id*. at 14-15.)

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric*., 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor

of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)).[1] Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250. The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went

---

[1] Federal Rule of Civil Procedure 56 was amended in 2010 to state: "The court shall grant summary judgment if the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled to judgment as a matter of law." (Emphasis added.) The analysis under the cases cited, however, remains the same.

uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co.  v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir.  2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v.  S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec.  Indus.  Co.  v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc.  v.  Pac.  Elec.  Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations omitted).

## III. DISCUSSION

### A. EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v.  Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104 F.3d  1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir.  1989).

A finding of deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's responses to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need

exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is serious, the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id.* Inadvertence, by itself, is insufficient to establish a cause of action under § 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096) (This second prong...is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference.").

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a

prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). In addition, it "may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, --- F.3d ---, 2013 WL 5813178, at * 9 (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006), *overruled on other grounds by WMX Techs, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)) (internal quotation marks omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner-or between medical professionals-concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Instead, to establish deliberate indifference in the context of a difference of opinion, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id.* at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

**B. SUMMARY OF MEDICAL EVIDENCE**

In support of his motion, Dr. Bannister has submitted various exhibits, including Plaintiff's relevant medical records. (Ex B- Doc. # 54-2 at 2, Ex. C-Docs. # 55-1, # 55-2.) In addition, Plaintiff has submitted various medical records and grievances related to his hernia in the exhibits supporting his motion. (Doc. # 63 at 67, 72-87, 111, 121-137.) As to the records submitted by Plaintiff which are not duplicative of those submitted by the defendant, Dr.

Bannister does not raise a dispute as to the contents of the records. The court will now summarize the relevant records.

The physical examination form dated July 15, 2008 notes a large left "reducible inguinal hernia" since 2003. (Doc. # 54-2 at 18.) Physician's orders of the same date state that Plaintiff is to return to the internal medicine clinic in two months and an appointment is to be scheduled with Dr. Mumford "per pt. request to have [left] inguinal hernia surgically repaired." (*Id*. at 6.)

Dr. Mumford (who appears to have been Plaintiff's treating physician at the time) referred a request for general surgery to the URP on August 11, 2008. (Doc. # 54-2 at 2; Doc. # 63 at 111.)  The stated reason for the referral is: "Requests surgery for moderate sized, easily reducible lt. inguinal [illegible word] hernia." (*Id*.) The request was disapproved by the URP on September 2, 2008, noting that the condition was to be "recheck[ed] in 6 months." (*Id*.) The August 11, 2008 physician's orders indicate a consultation request for URP for left inguinal hernia. (Doc. # 55-1 at 6.)

Plaintiff notes his "very bad hernia" needs to be "fixed" in a medical request dated June 29, 2010. (Doc. # 55-2 at 20.) He was scheduled to see a provider for sick call. (*Id*.)

Plaintiff sent a medical request on January 15, 2011, indicating that he was experiencing discomfort from his hernia. (Doc. # 55-2 at 17; Doc. # 63 at 67.) He was scheduled to see a provider. (*Id*.)

Plaintiff's medical records contain a "Medical Report of Incident, Injury or Unusual Occurrence" dated March 13, 2011, indicating a "mandown" incident. (Doc. # 55-1 at 2.) Plaintiff reported that he was working as a porter and when he lifted the mop bucket he felt a pull and pain in his groin. (*Id*.) A correctional officer "called mandown" when she saw Plaintiff "go down on his knees, in pain." (*Id*.) Plaintiff was observed as having a "slow, uneven gait" and

"guarding his left side." (*Id.*) He was given a pain pack and referred to "urgent sick call" in the morning. (*Id.*) Physician's orders dated March 14, 2011, indicate that a support and ibuprofen pain pack were issued. (*Id.* at 6.) He was ordered not to work for two days and no heavy lifting. (*Id.*) The progress notes of this date describe the hernia as "reducible but takes some effort." (*Id.* at 16.) He was prescribed ibuprofen, a support, and was advised not to lift anything heavy and not to work for two days. (*Id.*)

A memorandum dated March 14, 2011, indicates medical orders that Plaintiff is not permitted to work for two days and is not to engage in heavy lifting. (Doc. # 55-2 at 37.)

Plaintiff submitted an informal level grievance dated March 17, 2011. (Doc. # 63 at 78-79 (grievance 20062917300).) He states that has a bad hernia which was made worse when he pulled something working as a unit porter, but the doctor told him nothing could be done, but he is in pain and it is getting worse. (*Id.*) He requests that something be done to fix his condition. (*Id.*) The informal level response states: "The information that the physician's assistant gave you was correct, and even though you were given a support, you must not do any heavy lifting. Grievance denied." (*Id.* at 74.)

Plaintiff sent a request on March 18, 2011, referencing a really bad hernia, which he recently reinjured while working as a porter. (Doc. # 55-2 at 16; Doc. # 63 at 129.) He reports that the doctor told him they do not fix hernias. (*Id.*) He complains of pain and asks for help. (*Id.*) The response dated March 30, 2011, states: "The information that the provider gave you was correct. You were given a hernia support and told not to do any heavy lifting." (*Id.*)

Plaintiff sent another request on the same date stating that his hernia still hurts and the belt he was given was not helping. (Doc. # 55-2 at 19; Doc. # 63 at 131.) He reports having

13

trouble sleeping, using the bathroom, and bending over, and requests help. (*Id*.) The response states that he is on the list to see a provider. (*Id*.)

Plaintiff submitted a first level grievance (20062917300) dated April 8, 2011. (Doc. # 63 at 76-77.) Plaintiff states that he was experiencing pain every day, and asks for his hernia to be fixed. (*Id*.) The first level response states: "Mr. Green, I have reviewed your chart and asked that you be brought up to be seen by the provider on 4/21/11. Until you are seen, please do not do any heavy lifting and continue to use the support as instructed by the provider." (*Id*. at 73.)

Plaintiff sent a medical request dated April 15, 2011, stating that he was seen on March 14, 2011, but his hernia was still "very painful" and was "affect[ing] [his] daily activities." (Doc. # 63 at 127.) He states that his condition was "getting worse" and requested that it be fixed. (*Id*.)

On April 21, 2011, the physician's orders in Plaintiff's medical records indicate that he was issued a hernia truss and pain medication and was ordered not to perform work for one week and no heavy lifting for one week. (Doc. # 55-1 at 5.) The progress notes for this date indicate Plaintiff presented to the clinic with complaints of painful left inguinal hernia. (*Id*. at 15.) The hernia is noted as being "reducible" but with "difficulty." (*Id*.) Plaintiff described an increase in pain with reduction. (*Id*.) The nurse referred him to the provider. (*Id*.)  Additional progress notes on this date state that Plaintiff was complaining of pain associated with a hernia he had for eight years, which Plaintiff was having difficulty reducing. (*Id*.) He demanded surgery. (*Id*.) The hernia is described as reducible and Plaintiff was prescribed a truss, pain medication and was advised not to lift heavy objects or work for one week. (*Id*.)

The notes also state that the nurse discussed with Plaintiff that surgery is "elective." (*Id*. at 14.) He was told to increase the fiber in his diet and was prescribed Colace. (*Id*.) He was

advised to follow up with the nurse if he experienced severe pain, an increase in size or vomiting. (*Id.*)

A memorandum on this date indicates that Plaintiff is to "lay-in" for seven days and "no heavy lifting indefinitely." (Doc. # 55-2 at 36.) Plaintiff also acknowledged receipt of the medical hernia belt on April 21, 2011. (*Id.* at 38.)

Plaintiff submitted his second grievance, at the informal level (20062920131), dated April 25, 2011. (Doc. # 63 at 86-87.) He states that he saw the doctor on April 21, 2011, for his hernia, but "it hurts more now [than] it did before. The doctor who pushed and tried to force it back really hurt me. And as soon as I stood up it [popped] back out now it hurts more..." (*Id.* at 86.) He goes on to state that has used the hernia belt he was provided but it does not really help. (*Id.* at 87.) He again asks for the condition to be fixed. (*Id.*) The informal level response, with a transaction date of May 13, 2011, states: "When you saw the nurse practitioner on 4/21/11, she explained the NDOC policy regarding elective surgery to you. She also taught you the signs and symptoms to report, in addition to actions and activities to avoid. Grievance denied." (*Id.* at 83.)

Plaintiff submitted a second level grievance (20062917300) dated April 29, 2011, stating that he saw the medical provider and it "did no good," and reports that he remains in pain and his hernia was worsening. (Doc. # 63 at 75.) Dr. Bannister responded to the second level grievance, stating: "I agree with the response at the first level. Please follow the recommendation." (*Id.* at 72.) The "transaction date" of the response is listed as May 21, 2011. (*Id.*)

Plaintiff sent a request dated May 12, 2011, stating that he was told on April 21, 2011, that he would be prescribed pain medication but had yet to receive any medication. (Doc. # 55-2 at 11; Doc. # 63 at 125.) He states that he is still in pain. (*Id.*) He sent another request on May 15,

2011, stating that he was seen on March 14, 2011, for his hernia noting that it was still painful and was affecting his daily activities. (*Id*. at 14.) He was scheduled for sick call. (*Id*.)

He was prescribed an ibuprofen pain pack on May 15, 2011. (Doc. # 55-1 at 14.)

Plaintiff submitted a first level grievance (20062920131) dated May 23, 2011, stating that he saw the nurse on April 21, 2011, but she did not explain NDOC's surgery policy. (Doc. # 63 at 85.) Instead, he states that the nurse "forced [his] hernia in and said as long as it [goes] in we don't have to [fix] it." (*Id*.) Plaintiff indicates that as soon as he stood up, the hernia popped back out, and caused him significant pain. (*Id*.) He asks for surgery to fix the hernia, stating: "Charge me for the surgery. Anything[.] I can't take this pain everyday." (*Id*.) The response to the grievance states: "Mr. Green, I concur with the answer you received in your informal grievance. However, I did schedule you to see the provider again on Thursday morning, 6/2/11 to discuss your increase in pain." Grievance denied." (*Id*. at 82.)

Plaintiff submitted a second level grievance (20062920131) dated June 10, 2011. (Doc. # 63 at 84.) Plaintiff states that he saw the provider on June 2, 2011, "and they had no idea why I was up there." (*Id*.) He told the provider that his hernia hurt and that he was experiencing pain as a result and they told him there was nothing they could do. (*Id*.) Dr. Bannister responded to the second level grievance, with an action date of June 23, 2011. (*Id*. at 81.) His response states: "I agree with the response provided at the first level." (*Id*.)

On October 6, 2011, his left inguinal hernia is noted, but the focus seems to be on a history of non-Hodgkin's lymphoma. (*Id*. at 13.) He was prescribed an ibuprofen pain pack on this date. (Doc. # 55-1 at 14.)

16

He was seen on October 26, 2011, and it was noted that he was diagnosed in 2001 with a hernia. (*Id.* at 12.) It appears there is a notation for a referral to the URP. (*Id.*)

He was ordered transferred to Northern Nevada Correctional Center (NNCC) on November 1, 2011, to see Dr. Gedney. (Doc. # 55-1 at 4.) On November 26, 2011, Plaintiff sent a request complaining of pain related to his hernia stating: "I have a really bad hernia and it hurts all the time and when I lay down it [won't] go back in and it feels like [it's on] fire." (Doc. # 55-2 at 3; Doc. # 63 at 123.)

On December 5, 2011, Plaintiff filed a request to be seen by sick call for his hernia. (Doc. # 55-2 at 1, 9.)

Notes dated December 8, 2011, indicate that Plaintiff reported being "upset" about his hernia. (Doc. # 55-1 at 4.) He was scheduled to see Dr. Mar on January 11, 2012. (*Id.*) Progress notes dated January 18, 2012, do not mention his hernia. (*Id.*)

Progress notes dated December 15, 2011, state that Plaintiff was seen in sick call regarding his hernia he had for six or seven years which he reinjured six months prior while working as a porter. (*Id.* at 9.) He reported being in pain and that he had not been seen. (*Id.*)

Plaintiff was given an ibuprofen pack in January of 2012. (Doc. # 55-1 at 3.)

Plaintiff asked to be seen regarding his hernia on January 10, 2012, and was told he would be scheduled. (*Id.* at 37; Doc. # 63 at 121.) Plaintiff sent a medical request dated February 1, 2012, indicating that he had an appointment regarding his hernia that needed to be rescheduled because they were on lock down. (Doc. # 55-1 at 28.) He was told that he was scheduled. (*Id.*)

Progress notes dated February 2, 2012, indicate that Plaintiff has had a hernia for six to seven years and that he was wearing the truss. (Doc. # 55-1 at 8.) He reported no difficulty doing

17

his job. (*Id*.) The hernia is noted as being stable. (*Id*.) He is to follow up in six months. (*Id*.) Plaintiff was given an ibuprofen pack in March of 2012. (Doc. # 55-1 at 3.)

Plaintiff submitted a medical request dated March 17, 2013, stating that he saw Dr. Mar two days before regarding his hernia and was told he would be seeing a surgeon. (Doc. # 63 at 133.) He asked about the timing of his appointment. (*Id*.) The response states that Plaintiff would be scheduled if approved by the URP. (*Id*.) Incidentally, a referral to the surgery clinic for evaluation of the hernia was submitted on March 15, 2013. (*Id*. at 135.)

A consultant report dated April 15, 2013, states that the size of Plaintiff's hernia had increased and was "tight." (Doc. # 63 at 137.) The conclusion is that the hernia should be repaired. (*Id*.)

## C. STATUTE OF LIMITATIONS

Dr. Bannister argues that this action is barred by the applicable two-year statute of limitations because the alleged denial of hernia surgery took place in September 2008, and Plaintiff submitted this action for filing on January 5, 2012.

Plaintiff initially states that he is not asserting Dr. Bannister was deliberately indifferent to his serious medical need in connection with his denial of surgery as a member of the URP on September 2, 2008. (Doc. # 63 at 2, 6-8.) Instead, he asserts that Dr. Bannister knew of Plaintiff's medical issues related to his hernia, and Plaintiff specifically complained about the hernia and pain he was experiencing in grievances that Dr. Bannister himself responded to on two occasions in 2011, yet he has not received proper treatment. (*Id.* at 2-5.) Plaintiff claims Dr. Bannister has engaged in an ongoing violation of Plaintiff's Eighth Amendment rights. (*See* Doc. # 63 at 6, 8.)

The court agrees that Plaintiff's complaint does not allege deliberate indifference related to the denial of hernia surgery by Dr. Bannister, as a member of the URP, in September of 2008.

Even if Plaintiff were claiming deliberate indifference related to the determination made on September 2, 2008, Plaintiff is correct that Dr. Bannister has not properly established this affirmative defense.

Section 1983 does not contain its own statute of limitations; federal courts borrow the statute of limitations for section 1983 claims applicable to personal injury claims in the forum state. *See Wilson v. Garcia,* 471 U.S. 261, 279-80 (1985); *Johnson v. State of Cal.*, 207 F.3d 650, 653 (9th Cir. 2000) (citation omitted); *Fink v. Shedler*, 192 F.3d 911, 914 (9th Cir. 1999). "A statute of limitations begins to run on the date on which the plaintiff's claim 'accrues.'" *Pouncil v. Titon*, 704 F.3d 568, 573 (9th Cir. 2012) (citation omitted). "Federal law determines when a cause of action for a Section 1983 claim accrues and, hence, when the statute of limitations beings to run. *Id.* (citation omitted). "Under federal law, a claim accrues when the plaintiff knows, or should know, of the injury which is the basis of the cause of action." *Johnson*, 207 F.3d at 653 (citation omitted).

Federal courts also apply the forum state's law regarding tolling, including equitable tolling, when not inconsistent with federal law, to civil rights claims filed under section 1983. *Johnson*, 207 F.3d at 653 (citations omitted). "[T]he applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process." *Brown v. Valoff*, 422 F.3d 926, 942-43 (9th Cir. 2005) (citations omitted).

Dr. Bannister does not mention the exhaustion process; nor does he calculate any applicable tolling period while Plaintiff completed the exhaustion process. Accordingly, to the extent Plaintiff's complaint *can* be construed as asserting a deliberate indifference claim related to the URP determination made on September 2, 2008, Dr. Bannister has not met his burden in establishing he is entitled to summary judgment on statute of limitations grounds. The court also

concludes that the statute of limitations argument is without merit relative to Plaintiff's allegations that Dr. Bannister was deliberately indifferent from 2011 forward, as alleged in the complaint.

## D. EIGHTH AMENDMENT ANALYSIS

### 1. It is Undisputed Plaintiff Suffers from a Serious Medical Need

Dr. Bannister does not dispute that Plaintiff's hernia constitutes a serious medical need for purposes of the Eighth Amendment. Moreover, it is clear that Plaintiff's hernia is a condition that Plaintiff's doctors found "worthy of comment [and] treatment." *McGuckin*, 974 F.2d at 1059-60. Therefore, the court's analysis will focus on the deliberate indifference prong of Plaintiff's Eighth Amendment claim.

### 2. Genuine Disputes as to Material Facts Exist Regarding Whether Dr. Bannister's Conduct Amounts to Deliberate Indifference

Dr. Bannister argues that he is entitled to summary judgment because his determination to deny surgery as part of the URP in 2008 is merely a difference of opinion and it was not medically unacceptable under the circumstances or in conscious disregard of an excessive risk to Plaintiff's health. This argument is misplaced because, as the court noted above, Plaintiff's allegations of deliberate indifference are not centered on the denial of surgery in 2008. Instead, they center on the fact that Plaintiff repeatedly complained of pain related to his hernia and requested that his condition be fixed, and these issues were expressly communicated to Dr. Bannister via grievances, which Dr. Bannister denied as the second level grievance responder. As such, Dr. Bannister has not met his burden in establishing there is no genuine dispute as to any material fact and he is entitled to summary judgment as a matter of law.

Nonetheless, the court will address the argument asserted via Dr. Bannister's reply brief where he asserts that his conduct in 2011 does not amount to deliberate indifference because he was merely involved as a second level grievance responder and simply upheld the decisions made by lower level responders and that the care Plaintiff received was adequate. (*See* Doc. # 66.) As indicated at the outset, this brief is also considered Dr. Bannister's response to Plaintiff's cross-motion for summary judgment.

The court finds Dr. Bannister's argument that he is absolved of liability because his involvement in 2011 was limited to responding to Plaintiff's second level grievances is without merit. *See Snow v. McDaniel,* 681 F.3d 978, 989 (9th Cir. 2012) (finding that Warden McDaniel was not entitled to summary judgment where his involvement was limited to receiving grievances advising him of the inmate's medical condition and reviewing orders related to the inmate's condition).

In the first grievance submitted by Plaintiff on this issue (20062917300), Plaintiff stated that he was in pain every day and requested that the hernia be fixed. (Doc. # 63 at 76-77.) He was scheduled to see a provider on April 21, 2011, and that he should not do any heavy lifting and should use the support he was provided. (*Id*. at 73.) In the second level of that grievance, which went to Dr. Bannister, Plaintiff stated that he saw the provider, but it did not help. (*Id*. at 75.) He reported that he was still in pain and that things had gotten worse. (*Id*.) Dr. Bannister responded that he agreed with the first level response, seemingly ignoring Plaintiff's statement that he was still in pain despite having seen the provider again.

In the second grievance submitted by Plaintiff on this issue (20062920131), Plaintiff reported that his hernia was not reducing despite the nurse's attempts to force it in. (Doc. # 63 at 85.) He also indicated he was experiencing significant pain as a result, and requested surgery.

(*Id.*) The responder at the first level concurred with the informal level determination denying his grievance, but scheduled him to see a provider again on June 2, 2011, regarding his increased pain. (*Id.* at 82.) In the second level of that grievance, which went to Dr. Bannister, Plaintiff states that he did see the provider again on June 2, 2011, and told him about the pain, and was told nothing could be done. (*Id.* 84.) Dr. Bannister simply responded: "I agree with the response at the first level." (*Id.* at 81.) Once again, he does not acknowledge the substance of the second level grievance, where Plaintiff informs him that he is still in pain and was told by the treating medical provider that nothing could be done.

Thus, Dr. Bannister's argument that his conduct did "not render Defendant Bannister 'aware' of medical 'complications' that may or may not have been verified in a medical exam that he did not perform" (*see* Doc. # 66 at 3-5)  is untenable. Plaintiff specifically wrote in both of the second level grievances submitted on the issue that he had a hernia, he had seen his providers, he was still in pain, the providers told him nothing could be done, and he requested further action. Regardless of what occurred in medical examinations involving other providers, Dr. Bannister had personal knowledge of at least these facts from the second level grievances addressed to him and this is sufficient to create liability under the Eighth Amendment which requires a showing that the defendant knew of and disregarded a serious risk to Plaintiff's health.

While it is true that another URP referral was not submitted, at least not until mid-2013, these grievances specifically put Dr. Bannister on notice of Plaintiff's condition, that he was in pain as a result of the hernia despite being seen several times by the provider and being given a truss support, and that he was being told by his providers that nothing else could be done. Dr. Bannister's did nothing in response. Plaintiff's condition persisted into at least January 2012 as there are progress notes dated December 15, 2011, where Plaintiff reports being in pain related to

his hernia, and January 10, 2012, where Plaintiff asked to be seen for his hernia. (Doc. # 55-1 at 9, 37; Doc. # 63 at 121.) The court acknowledges that his hernia is noted as being stable in February 2012 (Doc. # 55-1 at 8), but a year later, in March 2013, Plaintiff was referred to the surgery clinic and it was concluded that the hernia should be surgically repaired. (Doc. # 63 at 133-137.)

To the extent Dr. Bannister's argument can be construed as asserting that his conduct in 2011 also constitutes a difference of opinion and to the extent Plaintiff has moved for summary judgment on his own behalf, the court finds that neither party is entitled to summary judgment because of existence of disputes as to material facts regarding whether Dr. Bannister disregarded an excessive risk to Plaintiff's health, whether his conduct was medically acceptable or unacceptable under the circumstances, and whether any delay in treatment led to further injury.

Plaintiff has submitted evidence documenting his complaints of pain, that his medical providers told him nothing could be done, and that he conveyed these facts to Dr. Bannister, who did nothing more to address Plaintiff's condition. Plaintiff has also submitted evidence that he was ultimately was referred for a consultant regarding his hernia and it was concluded that it should be surgically repaired. A jury believing Plaintiff's version of events could conclude Dr. Bannister was deliberately indifferent when he chose to do nothing in response to Plaintiff's grievances—that this was medically unacceptable and was in conscious disregard of a serious or excessive risk to Plaintiff's health.

Dr. Bannister, on the other hand, contends that there was no deliberate indifference because Plaintiff's hernia was capable of being reduced and it was not an emergent situation. (Doc. # 66 at 6, *see also* Doc. # 54-2 at 2, 18, Doc. # 55-1 at 16 (describing the hernia as reducible).) Believing Dr. Bannister's version of events, the jury could construe Dr. Bannister's

conduct as an extension of his "watchful waiting" approach from 2008 and find that there was no "excessive" or "serious" risk to Plaintiff's health and that his conduct was medically acceptable under the circumstances.

While Dr. Bannister characterizes Plaintiff's hernia as reducible, Plaintiff has submitted evidence to the contrary. (*See, e.g.,* Doc. # 55-1 at 15 (stating hernia is reducible, but with some effort and Pl. stating that he has difficulty reducing the hernia), Doc. # 63 at 85 (grievance indicating that the hernia popped out despite the nurse's attempt to push it in), Doc. # 63 at 86 (same), Doc. 55-2 at 3 (same).) If the jury believes Plaintiff's version of events, it could very well conclude there was a serious risk to Plaintiff's health and that Dr. Bannister's conduct was medically unacceptable.

Insofar as Dr. Bannister's conduct can be construed as a delay in providing treatment, the court finds that dispute exists as to whether the delay led to further injury. On the one hand, a jury believing Plaintiff's version of events that he continued to experience pain during the delay and was ultimately referred to surgery again could conclude that the delay amounts to deliberate indifference.

On the other hand, a jury could credit Dr. Bannister's statements that Plaintiff continued to receive adequate medical care from his providers and conclude there was no injury as a result of the delay. The fact that Plaintiff was ultimately referred for surgery again cuts against Dr. Bannister's position, but the court cannot make any definitive conclusion regarding whether Plaintiff in fact experienced further injury as a result of the delay in the absence of updated information regarding the current status of Plaintiff's hernia, *i.e.* whether the referral for surgery was approved and the circumstances surrounding the referral and URP review.

In sum, the court recommends that both Dr. Bannister's and Plaintiff's motions for summary judgment be denied because of the existence of genuine disputes as to material facts on Plaintiff's Eighth Amendment claim.

### IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **DENYING** both Dr. Bannister's (Doc. # 54) and Plaintiff's (Doc. # 64) motions for summary judgment.

**IT IS HEREBY FURTHER RECOMMENDED** that the District Judge enter an order **NOTIFYING PLAINTIFF OF ITS INTENT TO DISMISS WITHOUT PREJUDICE THE DOE DEFENDANT** pursuant to Rule 4 of the Federal Rules of Civil Procedure as a result of Plaintiff's failure to timely identify, name and serve such defendant.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

DATED:  December 8, 2013.

_____
**WILLIAM G. COBB**
**UNITED STATES MAGISTRATE JUDGE**

25